Sosman, J.
Plaintiff Falcucci Construction Company (“Falcucci”) has brought the present action alleging breach of contract on the part of the Boston Water and Sewer Commission (“BWSC”) based on BWSC’s failure to provide Falcucci with the quantity of work designated in the bid proposal. BWSC has moved for summary judgment on the ground that the contract gave it the express right to alter the quantity of actual work from the estimated amount without adjustment in price. For the following reasons, defendant’s motion is ALLOWED.
Facts
Falcucci is a small construction company that has provided emergency repairs and related construction work to BWSC since 1992. Each year, Falcucci would bid for this work based on BWSC’s estimates of the *152 volume and type of emergency repair work that would be required. In Falcucci’s experience over four years of these contracts, BWSC had assigned Falcucci other non-emergency repairs if the actual amount of emergency repair work turned out to be less than the estimates. Thus, the total amount of the work awarded to Falcucci in the past had been roughly equivalent to the amount estimated in the emergency repair contracts.
In late 1995, BWSC again put the contract for the upcoming year’s emergency repair services out to bid. The bid proposal contained estimated quantities for nineteen different repair items. The proposal did not contain any separate line item for overhead or for profit. Thus, the bidder’s overhead and profit had to be built in to the prices bid on each of the repair items. When Falcucci figured his prices on each, item, he assumed that, as in past years, the estimated quantities on each item were reasonably accurate or, if need be, would be made up for by assignment of other nonemergency repair work.
The bid proposal (and the later contract) provided the following with respect to the BWSC estimates on which the bids were to be based:
The quantities of Units specified in the Proposal are merely estimates of the quantities required to perform the work contemplated by this Contract, and the Commission reserves the right to increase or diminish the quantities of any such Units as it may deem necessary, without change of price per unit, provided that the increase of the sum of all such Units, including any work ordered at the fixed unit prices, does not exceed 15 per cent of the units of the individual line item as specified in the proposal.
In the event that the actual quantity or specified materials used varies more than 15 percent above the estimated quantity of the units of the individual line item stated in the' proposal, an equitable adjustment in the contract price shall be based upon any increase or decrease in costs due solely to the variation above 15 percent of the estimated quantity of each individual line item stated in the proposal . . .
The bid proposal also set strict requirements with regard to response time on emergency repairs, requiring that the contractor have a contact person on duty at all times and a crew ready to respond to the designated site within three hours. Given the time requirements, the contractor would have to incur substantial costs in advance of any requested performance.
Falcucci was the lowest bidder for the 1996 emergency repair services contract with a total bid of $795,750.80. Falcucci was awarded the contract. At Falcucci’s size, the $795,750 performance bond for this project filled up Falcucci’s bonding capacity, making it impossible for Falcucci to bid on any other public work for the duration of that contract.
Within a few months, it became apparent that BWSC was not ordering anywhere near the quantities of items estimated. The volume of actual emergency repair work was way down, and BWSC was no longer making up the difference by having Falcucci do non-emergency repairs. Because Falcucci had reached its bonding limit on this project, Falcucci was unable to make up the difference with other public contracting work. In June 1996, Falcucci notified BWSC of its concerns about the diminished volume of work and repeatedly requested an adjustment in the unit price to reflect the impact of these drastically reduced volumes. BWSC neither granted nor denied this request, but asked for more information and figures.
The situation did not improve over the remainder of the year. At the conclusion of the 1996 contract, Falcucci had only been asked to provide $276,495 worth of services and materials on what had been an estimated $795,751 contract. Whereas the original volume of work set forth in the estimates would have yielded Falcucci approximately $132,000 in profit, the reduced volume of work was inadequate to support the fixed overhead costs, and Falcucci lost approximately $86,000 on this contract. Falcucci’s requests for adjustment of the per unit price were ultimately denied on June 23, 1997, and the present suit followed.
Discussion
Falcucci’s complaint alleges that BWSC breached the contract (Count 1) when it failed to provide Falcucci with the quantities of work set forth in the estimates and failed to grant Falcucci an equitable adjustment. However, the express language of the contract made clear that the volumes stated in the bid were estimates only and that BWSC had the right to adjust the quantities. Indeed, given that the very nature of emergency repair work is unpredictable, it would be contradictory to treat estimates of the volume of such work as a guarantee that that volume of work would be called for. There was no promise to provide Falcucci with the estimated level of work and thus no breach of the contract for not providing that level of work.
The contract also expressly stated that BWSC’s right to increase or decrease the volume of work was to be “without change of price per unit.” Thus, even though the contractor’s fixed costs might have to borne by a much smaller number of units sold, BWSC was entitled to have that reduced work performed at the original per unit price. It is thus not a breach of the contract as written for BWSC to refuse to adjust the price.
Falcucci points out that the contract did provide for equitable adjustment in the event that the work was increased more than 15% over the estimated amount. From that, Falcucci suggests that the contract should also be interpreted to provide for an adjustment in the event of a decrease in work. Such an interpretation would be contrary to the contract’s clear wording. The *153 contract provided that BWSC could increase or decrease the number of units “without change of price per unit” as long as the “increase” did not exceed 15% of the amount set in the proposal. In the event that the amount ordered was more than 15% “above” the estimates in, the proposal, Falcucci could seek an equitable adjustment to the extent that the variation “above” 15% had affected costs. Where the contract provided that adjustments in quantity would not affect unit price, and the only stated exception to that provision was for an “increase” in quantity, it can not be read as applying to a decrease in quantity.
In Count II of the complaint, Falcucci recasts his claim as one for quantum meruit. Falcucci seeks “the fair and reasonable value” of the labor, equipment and materials provided to BWSC “with an appropriate mark-up for a fair amount of overhead and profit.” Recovery may be had under a theory of quantum meruit only in the absence of a binding, enforceable contract. Where, as here, there is an enforceable contract between the parties, quantum meruit is not a basis for altering the price set in that binding contract or otherwise rewriting what turn out to be lopsided terms.
Finally, in Count III, Falcucci seeks reformation of the contract for “mutual mistake of fact." Falcucci alleges that the parties entered into the contract in the mistaken belief “that there were sufficient units of work available as described in the bid document for the Project.” The contract expressly disclaims such a mistake, as it emphasizes that the unit levels in the proposal are only estimates" and that BWSC reserves the right to change its demands. Again, when the contract is for future emergency repairs- which are inherently unpredictable, there is no way that either side could predict that there would be a sufficient volume of emergencies.
The court is mindful that the terms of this contract, literally applied, can be veiy onerous to the contractor. With nowhere on the bid to list fixed overhead costs separately from the price per unit, with the need to incur substantial overhead costs in order to meet the performance time requirements of the contract, with the need to post a performance bond for the full amount of the estimated work, and with no assurance that that volume of work would turn out to be needed, the contractor’s unit price bid placed the contractor at great risk in the event (as here) that the actual volumes were substantially lower. It may also be that Falcucci’s prior contracts with BWSC, during which additional nonemergency work was assigned to make up any shortfall, gave Falcucci a false sense of security with regard to the estimates set forth on the 1996 proposal. However, nothing in the contract required BWSC to assign Falcucci noncontract work to compensate for any lack of contract work, and nothing in the contract now requires BWSC to adjust the price.
ORDER
For the foregoing reasons, defendant’s motion for summary judgment is ALLOWED and it is hereby ORDERED that judgment be entered in favor of defendant.